# COURT OF APPEALS
## DECISION
## DATED AND FILED

## February 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP2220**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV60

IN COURT OF APPEALS
DISTRICT III

---

D KAYSERI LLC - C/O ARDA YANIK,

   PLAINTIFF-APPELLANT,

 V.

510 MAIN STREET LLC - C/O MARY WOLSKE,

   DEFENDANT-RESPONDENT.

---

APPEAL from a judgment of the circuit court for Kewaunee County: DAVID L. WEBER, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1 PER CURIAM. D Kayseri LLC, by its agent Arda Yanik,[1] appeals from a summary judgment denying its claim for specific performance of a real estate purchase contract for property located at 510 Main Street, Kewaunee, Wisconsin (the property). The property is owned by 510 Main Street LLC, whose sole member is Mary Wolske.[2] The circuit court granted summary judgment to Mary after determining that no legally enforceable real estate contract existed between the parties because there was no written conveyance satisfying WIS. STAT. § 706.02 (2021-22),[3] also known as the statute of frauds. Additionally, the court determined that because Yanik was unable to prove that there was mutual consent to a legally binding real estate contract, he cannot claim equitable relief under WIS. STAT. § 706.04. We affirm.

## BACKGROUND

¶2 In 2020, Yanik first approached William to discuss purchasing the property. At that time, William was operating his law office out of the property. After a protracted period of negotiations—during which time a key issue was the terms of William's potential leaseback of the property so that he could continue to

---

[1] D Kayseri LLC is a Wisconsin limited liability company. Arda Yanik is a registered agent and the sole member of D Kayseri LLC. For ease of reading, we will refer to both Yanik and D Kayseri LLC as Yanik.

[2] 510 Main Street LLC is a Wisconsin limited liability company. In June 2016, William Wolske became the sole member of 510 Main Street, and in July 2016, his wife, Mary Wolske, acquired a fifty percent interest in the company. Mary Wolske is the current sole member of 510 Main Street after William Wolske's death on April 1, 2021.

Because these individuals share the same surname, we refer to them using their respective first names. For ease of reading, we also refer to both Mary and 510 Main Street LLC as Mary.

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

operate his law office—Yanik claims that in late March 2021 the parties "finalized" the terms and conditions of the sale of the property as well as the lease agreement.

¶3 On March 31, 2021, Yanik received correspondence that included the following documents: (1) a copy of an unrecorded quit claim deed for the transfer of the property; (2) a draft of a real estate transfer return; (3) a copy of the buyer's portion of the closing statement, stating the sale price for the property, the amount Yanik was to bring to closing, and the apportionment of the 2021 real estate taxes on the property; (4) a draft Memorandum of Lease agreement; and (5) both redlined and clean versions of the lease agreement (hereinafter, and collectively, the March correspondence). None of these attached documents were signed by either William or Yanik. The March correspondence also included a cover letter, signed on behalf of William by his assistant, indicating that the closing was scheduled to occur on April 9, 2021, and that Yanik should "bring a cashier's check in the amount of $70,030.00 payable to 'Wolske Law Office Trust Account.'"

¶4 Unfortunately, William passed away on April 1, 2021, before the parties could close on the property. When William died, Mary became the sole member of 510 Main Street, LLC. According to Yanik, he contacted Mary to inform her that he wanted to "postpone closing on the [p]roperty for forty (40) days due to [his] religious beliefs as well as to allow the Wolske family time to grieve." Subsequently, Yanik reached out to Mary again around May 18, 2021, to reschedule the closing. According to Yanik, Mary "refused to close on the [p]roperty pursuant to the terms of the agreement of the parties."

¶5      On June 11, 2021, Yanik's attorney sent Mary a demand letter stating that Yanik "still wish[ed] to move forward [with] the transactions and intend[s] to purchase the property from [Mary]" and that "[f]ailure to abide by the terms of the contract would be treated as a breach on behalf of [Mary]."  Mary's attorney responded that there was no enforceable contract because William never signed any of the documents, but he advised that Mary would consider an offer to purchase without the leaseback term.

¶6      Yanik then filed this lawsuit, demanding specific performance and damages for "construction delays and lost income."  Mary filed a motion for summary judgment, seeking dismissal of the action because there was no written contract that satisfies the requirements of the statute of frauds.  Yanik opposed the motion, arguing that numerous factual disputes precluded summary judgment. According to Yanik, the March correspondence met the requirements of WIS. STAT. § 706.02 because it contained William's signature on the cover letter and it showed "expressly on [its] face[] that [it] refer[s] to the same transaction, and the parties mutually acknowledged by conduct and agreement that the documents contained therein contained the final terms of the agreement." *See* § 706.02(2)(c). Further, Yanik claimed that even absent compliance with § 706.02, the agreement was enforceable in equity under WIS. STAT. § 706.04.

¶7      In an oral ruling, the circuit court granted Mary's motion for summary judgment.  The court agreed with Mary that the March correspondence failed to satisfy the requirements of the statute of frauds.  It further concluded that Yanik pled a breach of contract claim, but he had failed to plead a claim for equitable relief in his complaint.  Thus, the court did not believe that WIS. STAT. § 706.04 was applicable, but even if it did apply, the facts did not support

enforceability under the doctrine of equity. Based on its oral ruling, the court entered a written judgment dismissing the case with prejudice. Yanik appeals.

## DISCUSSION

¶8      At issue in this case is the circuit court's grant of summary judgment to Mary. We review a grant of summary judgment independently, but we employ the same methodology as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314-16, 401 N.W.2d 816 (1987). A party is entitled to summary judgment when the pleadings, depositions, affidavits, and other moving papers establish that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). "The inferences to be drawn from the underlying facts contained in the moving party's material must be viewed in the light most favorable to the party opposing the motion"—in this case, Yanik. *See Kraemer Bros., Inc. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 567, 278 N.W.2d 857 (1979).

¶9      On appeal, Yanik claims that the circuit court erred because there remained material factual disputes that should have precluded summary judgment. "The well-established purpose of summary judgment procedure is to determine the existence of genuine factual disputes in order to 'avoid trials where there is nothing to try.'" *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶16, 253 Wis. 2d 323, 646 N.W.2d 314 (citation omitted). While there may be unresolved factual issues, under the summary judgment methodology we may conclude that none of the factual disputes were material to the issue of whether the March correspondence satisfied the requirements of the statute of frauds. *See id.*; *Rollins Burdick Hunter, Inc. v. Hamilton*, 101 Wis. 2d 460, 470-71, 304 N.W.2d 752 (1981).

¶10    Additionally, upon summary judgment in an equitable action, if the circuit court determines that there are no material issues of fact for trial, the court must also determine whether, in its discretion, any equitable relief should follow. Thus, "when the grant of summary judgment is based on an equitable right, as in this case, we apply a two-tiered standard of review." *Pietrowski v. Dufrane*, 2001 WI App 175, ¶5, 247 Wis. 2d 232, 634 N.W.2d 109.  "We review the legal issues de novo.  However, the circuit court's decision to grant equitable relief is discretionary and, therefore, will not be overturned absent an erroneous exercise of discretion." *Id.* (citation omitted).  We sustain discretionary decisions if the court examined the relevant facts, applied a proper standard of law, and, using a rational process, reached a conclusion that a reasonable judge could reach.  *Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).

*I. Compliance with the Statute of Frauds, WIS. STAT. § 706.02*

¶11    The statute of frauds, pursuant to WIS. STAT. § 706.02, applies to "every transaction by which any interest in land is created, aliened, mortgaged, assigned or may be otherwise affected in law or in equity," subject to certain exclusions.  WIS. STAT. § 706.001(1).  Under § 706.02(1), a transaction is not "valid unless evidenced by a conveyance that satisfies *all* of the" listed requirements.  Sec. 706.02(1)(a)-(g) (emphasis added).  The parties appear to agree that the provision at issue in this case is § 706.02(1)(e), which requires that the conveyance be "signed by or on behalf of all parties, if a lease or contract to

convey."[4]  There is no dispute that Yanik never signed any documents pertaining to the sale of the property.  Likewise, as noted above, William did not sign any of the attached documents within the March correspondence.[5]  Accordingly, § 706.02(1)(e) was not satisfied.

¶12     Yanik argues, however, that the March correspondence satisfies the requirements of WIS. STAT. § 706.02(1)(e) via § 706.02(2).  Subsection 706.02(2) provides that "[a] conveyance may satisfy any of the foregoing requirements" of § 706.02(1):

> (a) By specific reference, in a writing signed as required, to extrinsic writings in existence when the conveyance is executed; or
>
> (b) By physical annexation of several writings to one another, with the mutual consent of the parties; or
>
> (c) By several writings which show expressly on their faces that they refer to the same transaction, and which the parties have mutually acknowledged by conduct or agreement as evidences of the transaction.

Sec. 706.02(2).

---

[4] We note that Yanik does not cite WIS. STAT. § 706.02(1)(e) specifically.  However, Mary does cite to that paragraph in her response brief, and Yanik does not object to or correct her reference in his reply.  In addition, neither party addresses any of the other paragraphs of § 706.02(1); therefore, we do not address them further.  *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop [the parties'] arguments.").

[5] Yanik admits that his signature was missing from the documents, but he argues on appeal that *his* signature "was the only formal requirement missing" pursuant to WIS. STAT. § 706.02(1).  He claims that William's signature on the cover letter satisfied the signature requirements of § 706.02(1) "even though the [c]ircuit [c]ourt failed to acknowledge his signature."  As we explain below, the signature on the cover letter was insufficient to satisfy the signature requirement in § 706.02(1)(e).

¶13     According to Yanik, the March correspondence satisfies WIS. STAT. § 706.02(2)(b) and (c) as "a written conveyance evidencing the final agreement of the parties."[6]     He claims that the March correspondence "was a physical annexation of several writings to one another, and the parties mutually consented to the terms contained therein." *See* § 706.02(2)(b).  Yanik also asserts that "[a]ll of the writings contained in the [March correspondence] show expressly on their faces that they refer to the same transaction.  In addition, … each of the parties mutually acknowledged the writings by their conduct as evidence of the transaction." *See* § 706.02(2)(c).  In the alternative, Yanik claims that the circuit court should have found a material issue of fact as to whether the formal requisites of § 706.02 were met and precluded summary judgment on that basis.

¶14     In support of his position, Yanik argues that his sworn affidavit provides evidence that he "assented to the agreement reached between the parties." Yanik also notes that he "reached out" to Mary "on at least two occasions following [William's] death to let [her] know he still intended to close on the [p]roperty and [to request] a closing date."  Yanik claims that Mary has put forth no evidence disputing these facts, but to the extent that Yanik's affidavit is disputed, it is a dispute of material fact precluding summary judgment.

¶15     As to William, Yanik argues that William's act of instructing his assistant to "draft the documents required to memorialize the terms of the sale of the [p]roperty and the [l]ease [a]greement and prepare correspondence forwarding

---

[6] In his brief-in-chief, Yanik argues that the March correspondence satisfies "both of [the] exceptions to the formal requisites established in WIS. STAT. § 706.02(2)(a) and (b)," but he later acknowledges in his reply brief that the March correspondence did not satisfy the requirements of § 706.02(2)(a) because it "is not 'signed as required.'"  Thus, we will not discuss § 706.02(2)(a) further.

drafts of the finalized documents" demonstrated that a "final agreement between the parties was reached." Finally, Yanik claims that the cover letter included with the March correspondence, signed on behalf of William by his assistant, demonstrated that William and Yanik "intended the documents as a final expression of their agreement."

¶16 We conclude, as did the circuit court, that the March correspondence failed to satisfy the statute of frauds. Specifically, we conclude that the record contains no evidence that the parties had reached an agreement as to all material aspects of the transaction. Pursuant to WIS. STAT. § 706.02(2)(b), while there may have been "physical annexation of several writings to one another" by virtue of the March correspondence, none of the attachments were signed by either party evidencing mutual consent to the specific terms of the agreement as a whole. The same is true under § 706.02(2)(c). The March correspondence may have been "several writings which show expressly on their faces that they refer to the same transaction," but there was insufficient evidence to establish that "the parties [had] mutually acknowledged by conduct or agreement" that the March correspondence was evidence of the finalized transaction.

¶17 For example, as the circuit court correctly identified, the lease agreements contained in the March correspondence demonstrate a lack of mutual consent. Importantly, the March correspondence contained both a redlined version of the lease agreement as well as a clean version. William's cover letter simply stated that "[t]he enclosed [l]ease includes the revisions we discussed." Nothing in the March correspondence stated that the clean version was the *final* version. The cover letter does not state that the parties reached an agreement as to all the details that needed to be addressed before the parties signed their names to the lease or whether they anticipated further changes to the lease prior to closing.

¶18     Instead, the record suggests that the lease agreement had been an ongoing point of contention between the parties from the beginning of the negotiations.  According to the record, a prior closing date was scheduled in August 2020, where it appears that the parties would either "proceed with the 'closing'" or make changes to the lease agreement.  Prior to that closing, Yanik indicated that "there were a couple of provisions that he did not understand" in the lease agreement, so he was having his attorney review it, but Yanik assured William that "you do not need to worry about [me] backing out of the purchase."  But back out he did because he was a "no show" on the closing date.  According to Yanik, "[m]y counsel advised me that the proposed [l]ease [a]greement was unfavorable to [my] interests and advised that the [l]ease [a]greement be negotiated further with" William.

¶19     Therefore, based on the history between the parties and the fact that William did not otherwise indicate that the lease agreement was the final version, we cannot conclude that the parties reached a final agreement before the April 9, 2021 closing date, as the lease agreement was a material term of the sale of the property.  In other words, the parties' conduct here does not demonstrate mutual consent to the sale or lease agreements.  Further, we disagree with Yanik's basic contention that the March correspondence was "a full and final agreement between the parties" because the question of "what are these [buyers] going to do with the leased premises if [William] is not around" is answered in the lease.[7]  Simply because a certain term was addressed in the draft of the lease does not mean,

---

[7] The draft of the lease included a section on automatic termination, which provided that "[u]nless terminated earlier, this [l]ease shall automatically terminate on the last day of the fifth (5th) month after the death of Tenant."

absent other evidence, that it was a final agreement with mutual consent of the parties.

¶20    To the extent that Yanik argues that William's signature, affixed by his assistant,[8] to the cover letter of the March correspondence establishes his consent to the entire agreement, we disagree. Yanik cites no authority providing that a signed cover letter legally binds the cover letter author to the unsigned documents enclosed with the letter. In fact, as Yanik explained, "Due to [William] having experience as an attorney and knowledge of real estate transactions, [William] would draft the documents and provide them to me. I would then review the documents provided and verbally discuss proposed revisions to the documents with [William]." Thus, there is evidence that it was the procedure of the parties—and a procedure common within the legal community—that William would send the revised drafts containing the parties' proposed revisions to Yanik to review. And based upon the parties' prior conduct, Yanik would then review the documents and, if necessary, have his attorney review the documents to determine if Yanik's agreeing to them was in his best interest. Contrary to Yanik's argument, we cannot assume that William's act of directing his assistant to draft and send the documents containing the proposed revisions to Yanik demonstrated that a final agreement was reached between the parties.

---

[8] At the hearing, the circuit court addressed the question of whether William's assistant would have authority to sign on behalf of William to bind him to this agreement, rather than simply sign on his behalf to send documents for review. Yanik asserted that this was a factual issue that should preclude summary judgment. However, our conclusion would be the same regardless of whether William's assistant did or did not have authority to sign for William in this capacity. The signature on the cover letter was insufficient to establish mutual consent.

¶21 Further, Yanik argues that "[i]f [William] did not consent to the agreement that the parties reached in the late March 2021 meeting, it stands to reason that he would not have sent the March 31 [c]orrespondence to Mr. Yanik." Again, we disagree. The revised documents merely set forth the status of the parties' negotiations as of late March 2021. Nothing within the March correspondence states that the documents are in final form and acceptable to either party as drafted.

¶22 Additionally, if we concluded that a signed cover letter binds a party to an agreement enclosed with it, that conclusion may lead to absurd results. Absent other evidence of mutual consent, a party could then always claim that any cover letter with attached documents was the final agreement and present evidence as to that issue in court. A dispute of this type is precisely what the statute of frauds seeks to avoid and would undermine the purpose of the doctrine. *See* **Kocinski v. Home Ins. Co.**, 147 Wis. 2d 728, 734-35, 433 N.W.2d 654 (Ct. App. 1988) ("The primary purpose of the Statute [of Frauds] is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made." (alteration in original; citation omitted)), *aff'd as modified and remanded*, 154 Wis. 2d 56, 452 N.W.2d 360 (1990).

¶23 Nothing within William's cover letter states that the enclosed documents memorialize the parties' understanding of the sale or that the documents are the parties' final agreement. The letter simply states that the documents are "[e]nclosed for your review" and reflected "the revisions we discussed." The March correspondence merely contained the last (prior to William's death) in a long line of modified documents attempting to set forth the

status of the parties' negotiations in preparation for a later closing on approved documents.

¶24 In conclusion, there was no enforceable written contract between the parties by which the circuit court could order specific performance. None of the documents contained within the March correspondence were signed by either party. *See* WIS. STAT. § 706.02(1). Further, regardless of any questions of fact, there was no evidence presented, under either § 706.02(2)(b) or (c), to establish mutual consent to the unsigned March correspondence documents under the circumstances presented here, either by evidence of William's signature on the cover letter or by the parties' conduct. The court did not err by granting summary judgment to Mary on this issue.

## II. *Equitable Relief under* WIS. STAT. *§ 706.04*

¶25 Yanik next argues that even if the March correspondence failed to meet the requirements of WIS. STAT. § 706.02, the agreement is enforceable pursuant to WIS. STAT. § 706.04. As an initial matter, Mary argues that Yanik failed to allege a cause of action under § 706.04 under the doctrine of equity in his complaint. She claims that pursuant to WIS. STAT. § 802.02, all claims for which a plaintiff seeks relief must be raised in the complaint. According to Mary, Yanik could have amended his complaint within the statutorily permitted time limit to include a § 706.04 claim, but he failed to do so. The circuit court agreed with Mary that Yanik did not plead equitable relief.

¶26 Our supreme court has determined that "in pleading a contract which is subject to the statute of frauds[,] it is not necessary to allege facts to establish that the contract does comply with the statute or is within its stated exceptions." *Ritterbusch v. Ritterbusch*, 50 Wis. 2d 633, 636, 184 N.W.2d 865 (1971).

13

Instead, "it [is] sufficient to allege the existence of a contract, leaving the determination of its validity under the statute of frauds for proof at the trial." *Id.* at 636-37 (citing ***Purtell v. Tehan***, 29 Wis. 2d 631, 636-37, 139 N.W.2d 655 (1966)).

¶27 Here, Mary appropriately pled the statute of frauds as an affirmative defense pursuant to WIS. STAT. § 802.02(3). *See also **Hine v. Vilter***, 88 Wis. 2d 645, 650, 277 N.W.2d 772 (1979) ("It is black-letter law that the defense of the statute of frauds is waived if not raised in the [circuit] court."). While Yanik's complaint does not refer to the statute of frauds, pursuant to the case law, he was not required to do so. *See **Ritterbusch***, 50 Wis. 2d at 636-37. Once Mary raised the statute of frauds in her answer and her motion for summary judgment, Yanik was then permitted to respond on summary judgment that, despite any asserted noncompliance with the statute of frauds, he was entitled to equitable relief under WIS. STAT. § 706.04. Mary did not require notice of Yanik's claim because she was the one who pled the statute of frauds as an affirmative defense. For this reason, the issue of whether Yanik was entitled to equitable relief pursuant to § 706.04 as an alternative to his breach of contract claim was properly before the circuit court.

¶28 Nevertheless, we agree with the circuit court that the elements of a transaction in this case cannot be proven in the first instance, and, therefore, the exceptions under WIS. STAT. § 706.04 do not apply. Section 706.04 comes into play when, as here, "[a] transaction … does not satisfy one or more of the requirements of [WIS. STAT. §] 706.02." *See* § 706.04. Instead, the transaction "may be enforceable in whole or in part under doctrines of equity, provided all of the elements of the transaction are clearly and satisfactorily proved" and provided

that the transaction falls within one of the exceptions enumerated in § 706.04. Sec. 706.04(1)-(3).

¶29     Thus, despite the fact that the parties' signatures were missing from the documents in this case, Yanik first has the burden to establish "all of the elements of the transaction" by clear and satisfactory evidence.  *See* WIS. STAT. §§ 706.02, 706.04; *Nelson v. Albrechtson*, 93 Wis. 2d 552, 559-60, 287 N.W.2d 811 (1980).  "The elements that must be established to fulfill the first requirement correspond to the formal requisites of a valid conveyance under [§] 706.02." *Nelson*, 93 Wis. 2d at 560; *Krauza v. Mauritz*, 78 Wis. 2d 276, 281, 254 N.W.2d 251 (1977) ("All that is required when an agreement for sale of real estate *is* in writing is that the conveyance identify the parties, land, the interest conveyed and 'any material term, condition, reservation, exception or contingency upon which the interest is to arise.'" (citation omitted)).

¶30     As we stated previously, Yanik cannot establish all the elements of this transaction because he cannot prove, by clear and satisfactory evidence, that there was mutual consent to the transaction:  none of the parties signed any of the transaction documents; there was no evidence of a finalized agreement on the material terms of the transaction; and William's signature on the cover letter of the March correspondence did not constitute a legally binding contract to sell the property.

¶31     Yanik argues, however, that our case law states "that a failure to execute a document can be cured in equity under WIS. STAT. § 706.04." *See Security Pac. Nat'l Bank v. Ginkowski*, 140 Wis. 2d 332, 334, 410 N.W.2d 589 (Ct. App. 1987).  In *Ginkowski*, we affirmed the circuit court's decision in a foreclosure proceeding to grant equitable reformation of a mortgage document

15

after the mortgagor raised the statute of frauds defense because he failed to sign the document and testified that he never intended to do so. *Id.* at 334. However, despite the fact that Ginkowski did not sign the mortgage at the time of closing, Ginkowski signed other documents relating to the loan closing. *Id.* at 334-35. The court found equitable reformation appropriate under § 706.04(1) because "[t]he signature requirement was here fulfilled by the [circuit] court's finding of assent." *Ginkowski*, 140 Wis. 2d at 337-38.

¶32    We conclude, as did the circuit court, that Yanik's reliance on *Ginkowski* is misplaced. Here, unlike in *Ginkowski*, neither William nor Yanik failed to sign just *one* of the transaction documents; instead, they did not sign *any* of the transaction documents because the closing never occurred. Further, while the *Ginkowski* court did state that "[t]he lack of a grantor's signature is a formal defect which can be cured by a [WIS. STAT. §] 706.04 equitable relief proceeding," the court also concluded that the statute "cannot be utilized to supply a grantor's assent: 'In order for a real estate transaction to be enforceable under [§] 706.04, it must at least be proved that the grantor or grantors assented to it.'" *Ginkowski*, 140 Wis. 2d at 336 (citation omitted). As noted above, no such assent can be adduced here.

¶33    In response to the circuit court's conclusion that *Ginkowski* is distinguishable, Yanik cites *Nelson* for the proposition that "Wisconsin courts have held that WIS. STAT. § 706.04 does not require the transaction to close or for the party claiming the agreement to be invalid to receive some benefit"—that benefit purportedly being recovery in equity. In *Nelson*, at issue was an oral agreement for the sale of a commercial building, which did not result in the sale of the property. *Nelson*, 93 Wis. 2d at 554. The appellants argued that they were entitled to relief under § 706.04. *Nelson*, 93 Wis. 2d at 554. Ultimately, the court

16

ruled against the appellants, finding that the seller's wife—who jointly held title to the property with her husband—never "agreed to convey her interest in the subject property to" the appellants. *Id.* at 561-62. Importantly, the *Nelson* court held:

> Although the lack of a grantor's signature is a formal defect which can be cured by application of [§] 706.04, … the lack of a grantor's assent to the transaction, which the signature merely symbolizes, is not. In order for a real estate transaction to be enforceable under [§] 706.04, it must at least be proved that the grantor or grantors assented to it. The assent of the parties is an essential element of even the most informal agreements.

*Nelson*, 93 Wis. 2d at 561.

¶34 Therefore, *Nelson* does not support Yanik's position. For a real estate transaction to be enforceable under WIS. STAT. § 706.04, it must first be proved that the grantor or grantors assented to it, *Nelson*, 93 Wis. 2d at 561, and here, as in *Nelson*, there is no evidence that William assented to the transaction. Therefore, Yanik has no claim for equitable relief under § 706.04, and the circuit court did not erroneously exercise its discretion by denying Yanik that relief.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

17