**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 9, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.      2021AP1087**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018FA205

**IN COURT OF APPEALS**
**DISTRICT IV**

IN RE THE MARRIAGE OF:

JOSEPH GENE THOMPSON,

   PETITIONER-RESPONDENT,

  V.

SUSANNE ROSE OUELLETTE,

   RESPONDENT-APPELLANT,

  V.

ELISABETH L. THOMPSON AND SAMUEL F. THOMPSON,

   OTHER PARTIES-RESPONDENTS.

APPEAL from a judgment of the circuit court for Waupaca County: VICKI L. CLUSSMAN, Judge. *Affirmed.*

Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1 GRAHAM, J. Susanne Ouellette, who was married to Joseph Thompson, appeals their judgment of divorce. In her appeal, Susanne challenges the circuit court's determination that an alleged oral agreement for the sale of real property owned by Joseph's parents, Elisabeth and Samuel Thompson, is not enforceable under WIS. STAT. § 706.04 (2019-20).[1] Susanne argues that she and Joseph entered into a land contract with Elisabeth and Samuel that is enforceable in equity. Therefore, she contends, the property is part of the marital estate and is property subject to division in the divorce pursuant to WIS. STAT. § 767.61(3). Elisabeth and Samuel argue that Susanne's appeal is frivolous, and they have filed a motion for costs, fees, and attorney fees pursuant to WIS. STAT. RULE 809.25(3).[2]

¶2 We affirm the circuit court's judgment, concluding that Susanne was not entitled to equitable enforcement of the alleged oral land contract under WIS. STAT. § 706.04 because she did not clearly and satisfactorily prove that the parties agreed on a purchase price and whether Susanne and Joseph would pay interest. We deny Elisabeth and Samuel's motion for costs, fees, and attorney fees based on our determination that Susanne's appeal is not entirely frivolous.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version.

Throughout this opinion, we refer to Joseph, Elisabeth, and Samuel by their first names because they share a surname. For consistency, we likewise refer to Susanne by her first name, even though she no longer shares a surname with the Thompsons.

[2] Joseph has not filed a brief in this appeal. Through counsel, he submitted a letter indicating that his interests are not affected by the issues raised in Susanne's brief and that he takes no position on the outcome of the appeal.

## BACKGROUND

¶3 Susanne and Joseph were married in 1998. From 2000 until 2018, they lived in a house in New London, Wisconsin (hereinafter "the property") that was at all times titled in Joseph's parents' names.

¶4 Joseph filed a petition for divorce in 2018. One significant dispute in the ensuing divorce action concerned whether the couple had an ownership interest in the property.

¶5 Specifically, the parties disputed whether Susanne and Joseph had purchased the property from Joseph's parents, Elisabeth and Samuel. There was no written agreement documenting the terms of any sale, let alone a conveyance that complied with other requirements in WIS. STAT. § 706.02, commonly referred to as the statute of frauds. However, Susanne took the position that the parties had agreed upon and entered into an oral land contract years earlier.[3] She argued that the agreement was enforceable under WIS. STAT. § 706.04, which permits a court to enforce an unwritten agreement for the sale of real estate in equity if the party requesting enforcement can, among other things, "clearly and satisfactorily" prove "the elements of the transaction." Joseph, Elisabeth, and Samuel took the position that Joseph and Susanne had been renting the property from Elisabeth and Samuel for all those years, and they disputed that there was any agreement for the sale of the property.

---

[3] A land contract is a means of financing the sale of real property that does not involve a conventional mortgage from a bank. *See generally* **City of Milwaukee v. Greenberg**, 163 Wis. 2d 28, 471 N.W.2d 33 (1991). In a land contract, the buyer makes direct payments to the seller. The seller retains legal title to the property until the purchase price is paid in full. The buyer, in contrast, holds equitable title to the property and enjoys rights, including the right of possession, over the land from the date of contract. *Id.* at 37-39.

¶6     To resolve this dispute, Joseph filed a third-party summons and complaint impleading Elisabeth and Samuel into the divorce action as third-party respondents. *See **Zabel v. Zabel***, 210 Wis. 2d 336, 341-44, 565 N.W.2d 240 (Ct. App. 1997) (providing that a court presiding over a divorce has jurisdiction to hear equitable claims involving third parties that are necessary for a complete adjudication of the divorcing parties' marital property rights). Joseph also sought a declaratory judgment that the property belonged to Elisabeth and Samuel, and that Susanne and Joseph had no ownership interest in the property.

¶7     Susanne and Joseph eventually entered into a partial marital settlement agreement that resolved all issues in the divorce action except for their dispute about whether they had any ownership interest in the property.[4] The circuit court held a contested hearing to resolve that dispute. At the hearing, Susanne, Joseph, and Karen Gething (an agent with the insurance company that provided homeowners and renters insurance to the parties) testified, and Susanne introduced several exhibits that were admitted into evidence. Samuel and Elisabeth attended the hearing, and their attorney cross-examined Susanne's witnesses. However, for reasons discussed below, Samuel and Elisabeth did not testify or present evidence at the hearing.

¶8     The following summary of facts is derived from the testimony and exhibits introduced by Susanne at the hearing. These facts were not meaningfully disputed, except as noted below.

---

[4] The partial marital settlement agreement provided that "[t]he Court shall decide any and all claims, controversies, and disputes concerning ownership interests of the property."

4

¶9     Susanne and Joseph moved into the house on the property in 2000. They lived there rent free until 2002, and then, beginning in 2002, they paid Elisabeth and Samuel $600 each month.

¶10    In 2005, Susanne and Joseph started to renovate the property.

¶11    In late 2007, Susanne, Joseph, Elisabeth, and Samuel started to discuss the possibility of Susanne and Joseph purchasing the property. According to Susanne, these discussions resulted in an oral land contract in January 2008. During the hearing, Susanne introduced a January 2008 receipt for "rent" on which Elisabeth had written "start sell of house * 08." Susanne testified that, from that point forward, she believed that she and Joseph had purchased the property and that their monthly payments of $600 were house payments rather than rent.

¶12    When asked about the terms of the 2008 agreement, Susanne testified that the agreement was that she and Joseph would pay "$600 a month" and also "the house taxes." However, Susanne did not consistently testify that the parties agreed on a purchase price in 2008. When asked about a total purchase price, Susanne testified that "[t]he $80,000 [figure] did come up," and that at some unspecified time she and Joseph agreed to it. However, she also testified that, prior to 2010, Elisabeth and Samuel had represented that the price would be between $75,000 and $80,000. Susanne further testified that the parties "didn't discuss interest rate" in 2008, nor did they discuss how long Susanne and Joseph would be required to make payments on the property before they owned it outright. According to Susanne, "[t]hat was always in question, we didn't know. Mr. Thompson, Sam, would always say we'll discuss it later."

¶13    Beginning in 2008, Joseph paid the property taxes on the property.

¶14    Between 2008 and 2010, Joseph and Susanne continued to renovate the property, making $80,000 to $100,000 worth of improvements. In 2010, Joseph started paying his parents' homeowner's insurance premium, and he then attempted to obtain his own homeowner's insurance policy on the property. As of August 2010, Elisabeth stopped issuing rent receipts to Susanne and Joseph.

¶15    In late 2010, Susanne made the monthly $600 payment by check, and she wrote "house payment" on the check. Elisabeth refused to cash the check due to the notation, and an argument ensued regarding Susanne and Joseph's ownership interests in the property. During the argument, Samuel insisted that the price of the property would be $80,000. According to Susanne, the non-negotiable price of $80,000 "set her off" because Elisabeth and Samuel had previously told them the price would be between $75,000 and $80,000. She testified that she had been upset because "there's kind of no discussion there, [Sam] just said 80, and that's it."

¶16    On December 5, 2010, Susanne drafted and sent to Samuel a letter seeking "clarity" about her and Joseph's ownership interests in the property, and the letter was admitted as an exhibit at the hearing. In the letter, Susanne noted that her check had been rejected because she had written "house payment" on it, but Susanne stated "that is what we feel it should be." She asked, "How can we be paying rent if this is our house?" In her letter, Susanne also acknowledged that the parties had not yet agreed on a price: "You and Liz said the house would be $75,000-$80,000 three years ago but just keep paying and when the time comes you would figure it out." Susanne finished the letter by stating, "Joe has put a huge amount of his money into the house," and "[w]e need to come up with a sensible solution for this house so we [can] continue the renovation."

¶17　After she sent the December 2010 letter, Susanne did not speak with Elisabeth or Samuel until 2012. However, Joseph and Samuel continued discussing the terms of an agreement to convey the property. Susanne testified that she believed that Samuel offered to sell the property for the reduced price of $71,000, as opposed to $80,000, based on discussions with Joseph that occurred sometime between December 5, and December 14, 2010.

¶18　On December 14, 2010, Samuel drafted a proposed offer to sell the property, which was admitted into evidence. The offer was not in the form of a land contract, as the parties had previously discussed. Instead, the offer was contingent on Susanne and Joseph obtaining a mortgage from a bank "within 60 days of today's date." On the first page, Samuel wrote:

> Price determined by negotiated price of $80,000 minus principle paid at 5 3/4% interest at $600 per month… If you wish to purchase the house and property … the cost is $71,000 … plus buyers pay all closing costs which your lender will take care of for you.

At the bottom of the page, Samuel printed and signed his name, and he drew signature blocks for Joseph and "wife." The remaining pages of the note contain an amortization table with certain figures circled and Samuel's handwritten notes. On the first page of the table, Samuel wrote that "[c]losing costs and any costs associated with your loan and title fees [are] all your responsibility! We get a check for $71,000."

¶19　Neither Joseph nor Susanne signed Samuel's offer letter, nor did they give Elisabeth and Samuel a check for $71,000. Susanne explained that she did not accept Samuel's offer because she believed that she had already purchased the property through a land contract in 2008 and because she and Joseph were unable to obtain a bank loan.

7

¶20    Susanne testified that negotiations continued until 2012, when Joseph obtained a homeowner's insurance policy on the property.  As Susanne described it, the terms of the ultimate agreement were reached as part of an "evolving process" and "there was always discussion."  However, Susanne acknowledged that she did not participate in any of those discussions, and she gave vague and sometimes inconsistent testimony on when the discussions occurred and her knowledge of any agreed-to terms.  She testified that "there's a verbal agreement for $600," and that "one day," as "part of the continuing discussion with his father," "Joe came home … and said there's going to be no interest."  At another point, when Susanne was asked whether the interest was a "modification to the agreement," she responded:  "I don't know.  I don't know what [Joseph] and his father discussed."

¶21    Between 2010 and 2012, Joseph attempted to obtain a homeowner's insurance policy on the property.  Susanne introduced a call activity log from the insurance company as evidence during the hearing.  The log details numerous conversations between insurance agents, Joseph, and Samuel, in which Joseph and Samuel made various changing representations to the agents.  In 2010, Joseph represented to the agents that he was "renting to buy [the] house from [his] dad."[5] That same year, Joseph told agents that his parents were "going to put [him] on the deed as homeowner," which would permit the company to issue a homeowner's

---

[5] A "rent-to-buy" agreement (sometimes called a "lease-purchase agreement") differs in some respects from a land contract.  A rent-to-buy agreement is a lease agreement in which the lessee retains an option to purchase the real estate upon the termination of the term of the lease, provided that the lessee completely performs its obligations under the lease.  *See generally* ***Faffensperger v. Van Kooy***, 260 Wis. 589, 592-93, 51 N.W.2d 488 (1952) (for an example of a lease-purchase agreement); ***Gillespie v. Dunlap***, 125 Wis. 2d 461, 462-63, 373 N.W.2d 61 (Ct. App. 1985) (same).

policy in Joseph's name. Then, in 2010, Joseph called to insure the property under his parents' name, rather than his own, "until the deed is transferred to his name which will be shortly." (Samuel did not transfer the deed in 2010, or at any other time.) Finally, in May 2012, an agent made the following notation in the call activity log, apparently based on representations between Samuel, Joseph, or both: "There is a land contract between Sam (dad) & Joe (son)" and the homeowner's policy should be written "in the name of Joseph & Susanne Thompson with Additional Insureds to read: Samuel F. & Elisabeth Thompson."

¶22 The insurance company issued a homeowner's policy for the property to Joseph and Susanne in 2012, and they dropped their renter's insurance. In his 2012 application for that policy, Joseph listed himself and Susanne as the owners of the property, represented that they had purchased the property in 2012, and wrote "Parents, Sam & Elisabeth Thompson selling home on land contract to their son, Joseph Thompson." The policy identified Joseph and Susanne as the primary insureds and his parents as additional insureds.

¶23 Susanne called Gething, an insurance agent who had worked with Joseph and Samuel, to testify about her recollection of the agreement that was reached in 2012. Gething testified that, to the best of her recollection, the terms of the agreement were that "it was going to be a 15-year land contract at five and a quarter percent interest." Gething did not testify to any knowledge or recollection of an agreed-upon purchase price.

¶24 After 2012, there appears to have been no further discussions between the parties about Susanne and Joseph purchasing the property. Susanne testified that after 2012, she treated the property as her own.

¶25 After presenting testimony by Susanne and Gething, Susanne rested her case. At that point, the circuit court asked Joseph, who was appearing pro se, if he had any witnesses, and he called himself to testify. Joseph did not dispute the authenticity of the exhibits Susanne had offered. He conceded that the parties had discussions about a sale of the property between 2008 and 2012, but he maintained that the discussions never resulted in an agreement. He testified that the insurance agents were either mistaken or lying, and that he had never represented to the insurance company that he was purchasing, or had purchased, the property.

¶26 After Susanne's attorney finished cross-examining Joseph, the circuit court informed the parties that it did not need to hear any further testimony because it had determined there was no valid land contract. The court explained that the alleged oral land contract was unenforceable because there was no conveyance that complied with the requirements set forth in the statute of frauds, and the facts introduced at the hearing did not satisfy the requirements of WIS. STAT. § 706.04.

¶27 The circuit court expressed the view that, based on the facts presented, "there's no way I could somehow reconstruct a land contract, a valid land contract, that was entered into by the parties." According to the court, "I don't know when this real estate was purchased, what the interest rate was supposed to be, the length of the contract, even the purchase price, because there were so many different things talked about." The court acknowledged that "there was a lot of talk" with the insurance company about Joseph and Susanne buying the property, but it stated: "I don't think that you can convey real estate by simply talking to your insurance agency about the fact that that's your intention."

¶28    Nevertheless, the circuit court indicated that the "intention of the parties is important," and that the parties' intentions would factor into the court's resolution of other issues in the divorce. The court found that Susanne "did intend to be putting money into this house because it was her intent to buy it and … enter into a land contract at some time, once everyone could decide on the amount. That she believed … it was a home that she was at some point going to own." By contrast, to the extent that Joseph "indicated that it was his position that all along he was making rent payments," that meant that at least some of the money he and Susanne had put into the property constituted "marital waste." That is, "[Susanne] is intending to buy the property, and [Joseph's] not, and yet he's allowing the marital funds to be put into improvements for this property, that he doesn't think he owns." The court indicated that Susanne "needs to be reimbursed" for the money she put "into this house under the belief that she was purchasing it."

¶29    Going forward, the circuit court said that it would dismiss Elisabeth and Samuel from the case, and that it would leave open the issue of marital waste for resolution at a subsequent hearing. Susanne did not object to the court's stated intention to dismiss the third-party claim against Elisabeth and Samuel, nor did she object to the fact that the circuit court issued its ruling prior to hearing their testimony.

¶30    The circuit court's oral decision was incorporated into its judgment, which was entered several months later on March 29, 2021.[6] Susanne appeals.

---

[6] It appears that the open issue of Joseph's alleged marital waste was not resolved prior to the entry of the divorce judgment, which provides: "The [circuit] court reserves jurisdiction over the issue of the monetary award to [Susanne] … for the damages/marital waste that was committed by [Joseph] concerning the property located … [in] New London, Wisconsin, and the contributions [Joseph] and/or [Susanne] made thereto."

(continued)

**DISCUSSION**

¶31 On appeal, Susanne contends that the circuit court erred by refusing to enforce the alleged oral land contract. She also takes issue with the manner in which the court conducted the hearing. For their part, Elisabeth and Samuel disagree with these positions and request sanctions on the ground that Susanne's appeal is frivolous. We address in turn Susanne's argument that the parties entered into an enforceable land contract, her procedural arguments about how the circuit court conducted the hearing, and Elisabeth and Samuel's arguments for sanctions.

**I**

¶32 WISCONSIN STAT. § 706.02, commonly referred to as the statute of frauds, requires that all sales of land be in writing. *See also **Krauza v. Mauritz***, 78 Wis. 2d 276, 279, 254 N.W.2d 251 (1977). It also imposes other formal requirements for such conveyances, including (among others) that they be signed, and that they identify the parties, the land, the interest conveyed, and "*any material term*, condition, reservation, exception, or contingency upon which the interest is to arise, continue, or be extinguished, limited, or encumbered." WIS. STAT. § 706.02(1) (emphasis added); ***Krauza***, 78 Wis. 2d at 281.

¶33 In this case, there is no dispute that the alleged land contract between the parties was never memorialized in a writing, much less a writing that complies with WIS. STAT. § 706.02. However, that does not settle the issue because,

---

The parties do not dispute that we have jurisdiction over this appeal, notwithstanding the fact that the judgment did not dispose of the entire matter in litigation between Susanne and Joseph, because the judgment did dispose of the entire matter in litigation as to Elisabeth and Samuel. *See* WIS. STAT. § 808.03(1).

notwithstanding the statute of frauds, a court may enforce an oral land transaction in equity if it meets the requirements set forth in WIS. STAT. § 706.04. *Nelson v. Albrechtson*, 93 Wis. 2d 552, 556, 287 N.W.2d 811 (1980) (citing *Krauza*, 78 Wis. 2d at 279).

¶34    Susanne's primary argument on appeal is that the circuit court erroneously exercised its discretion by refusing to enforce the oral land contract under WIS. STAT. § 706.04. Based on the evidence in the record, Susanne asserts that she met her burden of proof under § 706.04 by "clearly and satisfactorily" proving all the elements of the transaction, as well as the elements of equitable reformation, unjust enrichment, or equitable estoppel.

¶35    As an initial matter, we disagree with Susanne's characterization of the circuit court's decision as a "discretionary decision." As we now explain, the court determined as a matter of law that Susanne had not carried her burden of proof under WIS. STAT. § 706.04.

¶36    WISCONSIN STAT. § 706.04 provides, in pertinent part, that "[a] transaction which does not satisfy one or more of the requirements of [WIS. STAT. §] 706.02 may be enforceable in whole or in part under doctrines of equity, provided all of the elements of the transaction are clearly and satisfactorily proved." Additionally, § 706.04 requires that:

> (1) The deficiency of the conveyance may be supplied by reformation in equity; or
>
> (2) The party against whom enforcement is sought would be unjustly enriched if enforcement of the transaction were denied; or
>
> (3) The party against whom enforcement is sought is equitably estopped from asserting the deficiency.

13

¶37    By its unambiguous language, and according to prior interpretations of the statute, WIS. STAT. § 706.04 contains two requirements that must be proven before a court *may* exercise its discretion to enforce an oral land transaction. ***Spensley Feeds, Inc. v. Livingston Feed & Lumber, Inc.***, 128 Wis. 2d 279, 287-88, 381 N.W.2d 601 (Ct. App. 1985) (observing that two requirements must be met under the statute to qualify a real estate transaction for "the equitable alternative" to the statute of frauds).  First, "the elements of the transaction must be clearly and satisfactorily proved."  *See* § 706.04; *see also* ***Spensley Feeds***, 128 Wis. 2d at 287-88.  And second, the party requesting enforcement must establish that one of the statutorily enumerated equitable exceptions to the statute of frauds applies.  *See* § 706.04(1)-(3); ***Spensley Feeds***, 128 Wis. 2d at 287-88.  If a party fails to prove one of the two requirements, then the circuit court does not reach the question of whether, in its discretion, it should enforce the transaction.  Conversely, even if both requirements are proven, a circuit court *may*, but need not, enforce the transaction under the statute.  *See* § 706.04 (providing that the transaction "may be enforceable in whole or in part" if the statutory requirements are met); ***Heritage Farms, Inc. v. Markel Ins. Co.***, 2012 WI 26, ¶32, 339 Wis. 2d 125, 810 N.W.2d 465 (noting that "we generally construe the word 'may' as permissive").

¶38    Here, the circuit court concluded that Susanne failed to clearly and satisfactorily prove "the elements of the transaction."  And, as this court has previously explained, whether a party satisfies its "burden of proof under WIS. STAT. § 706.04 is a question of law we review de novo."  ***Lenhardt v. Lenhardt***, 2000 WI App 201, ¶6, 238 Wis. 2d 535, 618 N.W.2d 218.  We therefore independently assess whether Susanne clearly and satisfactorily proved the elements of the alleged oral land contract under § 706.04, affording no deference

to the circuit court's legal conclusions, but deferring to any factual findings by the circuit court unless they are clearly erroneous. *Id.*

¶39    We now consider whether Susanne proved "the elements of the transaction," as required by WIS. STAT. § 706.04.  Section 706.04 does not specifically identify what is meant by "elements of the transaction."  However, our cases establish that these elements "appear to correspond to," but do not match precisely, "the formal requisites for a valid conveyance under WIS. STAT. § 706.02."  *Nelson*, 93 Wis. 2d at 560 (citing *Krauza*, 78 Wis. 2d at 281).  In *Nelson*, for example, our supreme court concluded that a grantor's assent, which corresponds to § 706.02's requirement that conveyances be signed by the parties, is one essential element a party seeking to prove the elements of the transaction must always prove.  *Id.* at 561 ("[L]ack of a grantor's signature is a formal defect which can be cured by application of § 706.04," but "lack of a grantor's assent to the transaction, which the signature merely symbolizes, is not.").

¶40    One of the formal requirements set forth in WIS. STAT. § 706.04 is that a conveyance identify any "material term" to the transaction.  What constitutes a "material term" is not defined by either WIS. STAT. ch. 706 or case law, and may vary depending on the type of conveyance at issue.  Here, however, the parties agree that, at the very least, Susanne must prove an agreement on the purchase price and whether there would be interest on that purchase price.  We agree that purchase price and interest are "material terms" in an agreement to

15

convey real property.[7] *See Krauza*, 78 Wis. 2d at 280-81 (concluding that the party requesting equitable enforcement under § 706.04 had satisfied the first requirement of the statute by proving, among other things, that the sellers had agreed to sell back "what [they] had in [the farm]" for a "repurchase price of $50,000, plus interest on the [seller's outstanding] mortgage loan at seven percent"); *see also Headstart Bldg., LLC v. National Centers for Learning Excellence, Inc.*, 2017 WI App 81, ¶17, 379 Wis. 2d 346, 905 N.W.2d 147 ("Price is an essential term for a contract of real estate; a contract is void unless the price is 'certain or capable of being ascertained from the agreement itself.'" (quoted source omitted)).

¶41     We further observe that, as with any contract, the "material terms" of an oral agreement to convey land must be sufficiently definite to evince an agreement.  *See Krauza*, 78 Wis. 2d at 280-81 (providing that terms of an oral agreement that "would not fail for indefiniteness" if reduced to writing "ought not so fail when tested under" WIS. STAT. § 706.04); *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996) (providing that "[v]agueness or indefiniteness as to an essential term of [an] agreement *prevents the creation* of an enforceable contract, because a contract must be definite as to the parties' basic commitments and obligations").  The definiteness requirement is satisfied when there has been "mutual assent"

---

[7] The circuit court also explained that it could not determine when the land contract was to begin or end, or the length of the contract.  We need not address whether these terms are "elements of the transaction" that must be proved under WIS. STAT. § 706.04 based on our conclusion, which is dispositive, that Susanne has not proven the purchase price or interest rate of the land contract.  For the same reason, we do not address the Thompsons' argument that earnest money, type of deed, title insurance, duration of amortization, or down payment are "elements of the transaction" under § 706.04.

(sometimes referred to as a "meeting of the minds") as to the essential terms of a contract, such that the terms can be ascertained and enforced with "reasonable certainty." *See Headstart Bldg., LLC*, 379 Wis. 2d 346, ¶¶17-19.

¶42 Finally, WIS. STAT. § 706.04 requires that the elements of the transaction, which include its sufficiently definite material terms, be "clearly and satisfactorily proved." This phrase refers to the quantum of evidence needed to satisfy one's burden of proof under the statute, and is a higher burden than a mere preponderance of the evidence. *See Security Pacific Nat'l Bank v. Ginkowski*, 140 Wis. 2d 332, 336-38, 410 N.W.2d 598 (Ct. App. 1987).

¶43 Here, the circuit court effectively found that, despite ongoing discussions, the parties did not reach a definite agreement on the purchase price or interest rate. Although the circuit court's explicit factual findings were limited, it appears the court determined that, even if it were to credit every fact that Susanne introduced in her case in chief, those facts would be insufficient to clearly and satisfactorily prove that the parties reached any definite agreement on those material terms.[8]

---

[8] Susanne asserts that the circuit court erroneously exercised its discretion because its brief oral ruling contained "essentially no findings or analysis … about the factual basis for the absence of a land contract or the denial of enforcing or reforming the land contract in equity." As such, she requests that, if we do not reverse the circuit court's judgment outright, we remand for additional factual findings.

To the extent that Susanne means to argue that the circuit court did not address whether she had "clearly and satisfactorily proved the element of the transaction" as required by WIS. STAT. § 706.04, we disagree. Although the court did not use that precise language, it is evident that the court was considering the statutory standard when it stated that it could not "somehow reconstruct" a valid land contract because it did not "know when this real estate was purchased, what the interest rate was supposed to be, the length of the contract, even the purchase price[.]"

(continued)

17

¶44 Before reviewing this conclusion, a brief aside is in order about the factual position taken by Joseph in the circuit court. It is apparent from the record that, at least at some points, all parties expected that Susanne and Joseph would purchase the property from Elisabeth and Samuel, and, at times, some or all of the parties acted based on that expectation. Specifically, Susanne made payments that she thought were toward ownership of the property, Joseph renovated the property, and, unless the insurance agents were mistaken or lying in their contemporaneous notes, Joseph represented to his insurance company that he had purchased the property from his parents. It is true that the parties never memorialized their expectations in writing, and, after Joseph filed for divorce, he and his parents asserted the statute of frauds as a defense. However, the position that Joseph took in the circuit court—that he and Susanne never intended to be anything but renters—appears entirely inconsistent with his actions and his representations during his marriage to Susanne and others that they owned the property (or at least that they would someday).

¶45 That said, it remains true that a mutual expectation between putative buyers and sellers that property would be conveyed is not enough to create a legally enforceable agreement for the sale of real estate. As discussed above, WIS. STAT. § 706.04 requires that the elements of an unwritten agreement be clearly and

To the extent that Susanne means to argue that the circuit court was required to address whether she satisfied one of the equitable exceptions to the statute of frauds enumerated in WIS. STAT. § 706.04, we likewise disagree. The court's conclusion that Susanne did not clearly and satisfactorily prove "the elements of the transaction" rendered unnecessary any discussion of § 706.04's equitable exceptions. *See Lenhardt v. Lenhardt*, 2000 WI App 201, ¶8, 238 Wis. 2d 535, 618 N.W.2d 218 (stating that it was unnecessary to consider the equitable exceptions because the elements of the transaction were not clearly and satisfactorily proved).

satisfactorily proved, which in turn, requires a party to prove sufficiently definite material terms that can be enforced.

¶46    We now review the circuit court's factual findings and legal conclusions to determine whether Susanne has met her burden of proof under WIS. STAT. § 706.04.

¶47    According to Susanne, the evidence introduced at the hearing shows that, on January 1, 2008, the parties agreed that Susanne and Joseph would purchase the property for $80,000; the price was reduced to $71,000 in 2010; and the parties agreed on a land contract with no interest sometime between 2010 and 2012.  Contrary to a suggestion in Elisabeth and Samuel's brief, we do not think that it is fatal to Susanne's argument that she testified to terms that "were arrived at over the course of approximately four years" through an "evolving process." Under other circumstances, it might well be that an enforceable agreement could be reached through successive discussions at different times.  *See, e.g.*, ***Krauza***, 78 Wis. 2d at 280-81 (providing that the "parameters of the agreement were fixed" when the parties initially met and agreed to certain terms, and their subsequent agreement on price and interest rate supplied the remaining material terms).

¶48    Here, however, the evidence does not show that there were successive discussions of discrete terms that eventually resulted in a fully fleshed out agreement.  Rather, the record suggests that the ongoing conversations Susanne testified about tended to cancel out progress that was purportedly made in earlier conversations, or in some instances, the later discussions undermine Susanne's testimony that any earlier agreement had ever been reached.

¶49    For example, the trial evidence demonstrates that the parties did not reach any agreement on purchase price in 2008.  Susanne argues that the parties

19

agreed to an $80,000 purchase price in 2008, but her own letter, dated December 5, 2010, dispels any such notion. In that letter, Susanne asserted that Samuel and Elisabeth "said the house would be $75,000-$80,000 three years ago but just keep paying [$600 a month] and when the time comes you would figure it out." Elisabeth's "start sell of house" notation on the January 2008 rent receipt suggests that the parties may have reached some sort of understanding in 2008 that Susanne and Joseph would purchase the property, but Susanne's letter demonstrates that, at that time, the understanding shared by the parties was that they would later "figure … out" the material terms of their agreement "when the time comes."

¶50 Nor does the trial evidence clearly and satisfactorily prove that the parties reached an agreement on purchase price in 2010. As noted, Susanne's current position is that the purchase price was "modified" in 2010 to $71,000. She asserts that this modification resulted from discussions between Samuel and Joseph that occurred sometime between December 5 and 14, and she points to Samuel's December 14, 2010 letter in which he offered to sell the property for $71,000. However, Samuel's offer required that the purchase be financed with a traditional mortgage, not a land contract, and, critically, Susanne and Joseph rejected Samuel's offer. Susanne does not point to any evidence in the record to suggest that the parties maintained or resurrected any portion of the rejected offer, including the purchase price.

¶51 Finally, the trial evidence does not clearly and satisfactorily prove that the parties reached an agreement on purchase price or interest between 2010 and 2012. As stated above, Susanne contends that Joseph and Samuel continued negotiating the terms from 2010 until 2012, when Joseph obtained a homeowner's insurance policy on the property, and that the terms of the ultimate agreement

were for a land contract at the modified purchase price of $71,000 with no interest. To be sure, Joseph's and Samuel's representations to insurance agents during this period tend to corroborate Susanne's position that discussions continued, and that eventually, Joseph and Samuel agreed to "go the land contract route." However, the evidence about the terms of that 2012 agreement for a land contract is missing or contradictory.

¶52 Again, Susanne presented no evidence regarding an agreed-upon purchase price. The record is devoid of facts suggesting whether Samuel and Joseph retained the $71,000 purchase price from Samuel's rejected offer, arrived at a different purchase price, or did not discuss price at all and instead agreed that Susanne and Joseph would continue paying $600 a month under an understanding that they would "figure it out" "when the time comes."

¶53 As for any agreement on interest being reached sometime between 2010 and 2012, Susanne testified that Joseph came home one day and announced that there would be no interest. However, Susanne was not present for these conversations, and on cross-examination she acknowledged that she "[did not] know what [Joseph] and his father talked about." Moreover, Gething, who was Susanne's own witness, testified to terms that contradict Susanne's position. Gething testified that her understanding of the agreement was that it would "be a 15-year land contract at five and a quarter percent interest." Susanne argues that Gething's testimony supports her contention that there was a land contract, but she ignores the reality that Gething's testimony—that there *would* be interest–undermines her position that the parties reached a definite agreement that there *would not* be interest.

21

¶54    As discussed above, WIS. STAT. § 706.04 requires that the elements of the transaction be "clearly and satisfactorily proved."  Here, the circuit court correctly determined that Susanne did not prove material terms of the alleged oral land contract that were fixed and sufficiently definite to be enforced.

## II

¶55    We now address Susanne's arguments concerning the manner in which the circuit court conducted the contested hearing.

¶56    To recap, Susanne and Gething testified at the hearing, the court accepted Susanne's exhibits into evidence, and Susanne's attorney represented to the court that he had no further evidence to present.  Joseph, appearing pro se, started to present his case by calling himself as a witness.  The court questioned Joseph, Susanne's attorney cross-examined him, and Elisabeth and Samuel's attorney was about to begin his examination of Joseph.  The court then indicated that it did not need any further testimony or evidence.  It was at that point that the court determined that there was no valid land contract and that it would be dismissing Elisabeth and Samuel from the divorce proceeding.  Susanne's attorney was given the opportunity to comment but did not object to this procedure or to Elisabeth and Samuel's dismissal.

¶57    However, on appeal, Susanne takes issue with the above-described procedure for two separate reasons.

¶58    Her first claim of procedural error is that the circuit court erroneously exercised its discretion when it issued its ruling prior to the close of evidence.  Susanne argues that this ruling precluded her from presenting additional evidence to prove the existence of the land contract, and she faults the court for

22

"not provid[ing] findings as to why there was no need for further testimony or [explanation as to] why the … court was stopping testimony."

¶59   As an initial matter, contrary to Susanne's assertions, it is apparent from the transcript why the circuit court determined that no further testimony was needed.  As we have discussed, it was Susanne's burden of proof to clearly and satisfactorily prove the elements of the transaction, and the circuit court concluded that she had not satisfied that burden during her case in chief.  As such, the court evidently determined on that basis that it would be appropriate to issue a ruling at the close of Susanne's evidence under WIS. STAT. § 805.17.

¶60   In any event, we decline to address whether the court's decision, made without a motion from any party, was an erroneous exercise of discretion for two reasons.  First, Susanne forfeited her argument about additional evidence by failing to timely object during the circuit court proceedings.  *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (providing that, as a general rule, a party forfeits an issue for purposes of appeal when a party fails to raise an issue before the circuit court).  Susanne argues that she was not required to object because "the trial court's decision regarding further testimony was made and the dismissal complete," and "any objection raised by counsel would have been to the trial court's ruling, which is what the appellate process is for."  We disagree.  The rule against forfeiture "enable[s] the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal."  *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612 (footnotes omitted).  The rule also gives the parties and circuit court "notice of the issue and a fair opportunity to address the objection," "encourages attorneys to diligently prepare for and conduct trials," and "prevents attorneys from 'sandbagging' opposing counsel by failing to object

23

to an error for strategic reasons and later claiming that the error is grounds for reversal." *Id.* For all these reasons, a timely objection was required to preserve any error for appeal.

¶61 Second, even if we were to overlook Susanne's forfeiture, she fails to explain why any error by the circuit court should result in a reversal of the court's decision. Susanne cites no case or statute that precludes a circuit court from issuing its ruling at the close of plaintiffs' evidence under WIS. STAT. § 805.17, absent any objection or motion from a party. *Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 (internal citations omitted) (providing that we need not consider arguments unsupported by legal authority). But even if it were error to do so, reversal would not be warranted unless the error affected Susanne's substantial rights, meaning that there is a reasonable possibility that the error contributed to the outcome of the proceedings. WIS. STAT. § 805.18(2); *Martindale v. Ripp*, 2001 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698. Here, Susanne identifies no evidence that she would have presented for the circuit court's consideration but was prevented from doing so by the court's ruling.

¶62 Susanne's second claim of error is that it was an erroneous exercise of discretion for the circuit court to dismiss Elisabeth and Samuel from the case. However, Susanne's arguments in favor of this position are difficult to understand.

¶63 In her opening appellate brief, Susanne asserts that the circuit court could not dismiss Elisabeth and Samuel—even after concluding the property belonged to them and was not a part of the marital estate—because they did not file an answer to Joseph's third-party complaint and never argued that the court lacked jurisdiction over themselves or the property. According to Susanne, by

failing to assert that defense, Elisabeth and Samuel waived any defense of lack of jurisdiction. This argument fails because the court's dismissal was not based on jurisdictional grounds. Rather, the court dismissed them because it concluded that the property belonged to Elizabeth and Samuel and was not part of the marital estate.

¶64 In her reply brief, Susanne advances a new argument as to why it was nonetheless improper to dismiss Elisabeth and Samuel. She asserts that the circuit court's conclusion under WIS. STAT. § 706.04 did not supply a "sufficient basis to dismiss" because the circuit court "found that there was marital waste," and "recovery could still be sought from Elisabeth and Samuel." We again observe that, as with Susanne's prior argument, she forfeited this argument on appeal by not timely objecting during the circuit court proceedings. But even if we were to overlook this forfeiture, we would reject this new argument as undeveloped. Susanne cites no case or statute that stands for the proposition that persons other than parties to a marriage can commit marital waste. And the single case that she does cite undermines her argument that a claim for compensation from Elisabeth or Samuel could be adjudicated in this divorce action if the property is not part of the marital estate. *See Zabel*, 210 Wis. 2d at 338 n.1, 346.

### III

¶65 Elisabeth and Samuel contend that Susanne's appeal is frivolous under WIS. STAT. RULE 809.25(3)(c)2., and they ask for an award of costs, fees, and attorney fees under RULE 809.25(3)(a)-(c).

¶66 Whether an appeal is frivolous is a question of law. *Howell v. Denomie*, 2005 WI 81, ¶9, 282 Wis. 2d 130, 698 N.W.2d 621. Sanctions for a frivolous appeal will be imposed if the court concludes that the "'party or party's

attorney knew, or should have known, that the appeal … [had no] reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.'" ***Id.*** (quoting WIS. STAT. RULE 809.25(3)(c)2.). This standard is objective, so we must examine what a "reasonable party or attorney knew or should have known under the same or similar circumstances." ***Id.*** Importantly, to award costs and attorney fees, we "must conclude that the entire appeal is frivolous." ***Id.*** In deciding whether an appeal is frivolous under RULE 809.25(3)(c)2., we "resolve all doubt in favor of finding the claim[s] nonfrivolous." ***Dietscher v. Pension Bd. of Employees' Retirement Sys. of Milwaukee***, 2019 WI App 37, ¶56, 388 Wis. 2d 225, 932 N.W.2d 446.

¶67 As we have discussed, Susanne's arguments on appeal are weak, and she has not persuaded us that the circuit court erred in any way. However, we cannot conclude that Susanne's entire appeal lacks any "'reasonable basis in law or equity.'" *See* ***Howell***, 282 Wis. 2d 130, ¶9 (quoting WIS. STAT. RULE 809.25(3)(c)2.). The main issue underlying Susanne's appeal concerns the quantum of proof required to "clearly and satisfactorily" prove the "elements of the transaction." *See* WIS. STAT. § 706.04. As we have discussed, Susanne directs us to evidence in the record suggesting that, at the very least, the parties reached various mutual understandings between 2008 and 2012, and that Joseph and Susanne were making payments believing they would someday own the house. Although we have concluded that those understandings were not sufficiently definite to amount to anything more than an agreement to agree, some evidence in the record provides at least the raw material for a potential argument that the parties' understandings should be enforced.

## CONCLUSION

¶68    For the reasons explained above, we conclude that the circuit court did not err when it determined that Susanne is not entitled to equitable enforcement of an alleged oral land contract under WIS. STAT. § 706.04, and that her procedural arguments are forfeited and underdeveloped.  Although we affirm the circuit court's judgment, we deny the Thompsons' motion for costs, fees, and attorney fees under WIS. STAT. RULE 809.25(3)(a)-(c) because Susanne's primary argument on appeal is not entirely frivolous.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.